# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA     )
                                    )

        v.                      )     Case No. 08 CR 746
                                    )     HONORABLE CHARLES R. NORGLE

AUGUSTIN ZAMBRANO, *et al.*    )

                                    )
        Defendants.     )

## OPINION

CHARLES R. NORGLE, District Judge:

Before the Court is the Government's Motion to Empanel an Anonymous Jury. For the following reasons, the government's Motion is granted.

## I. BACKGROUND

This case involves the United States's ongoing prosecution of members of the Latin Kings street gang. The Court has taken twenty-three guilty pleas in this case to date, many based on admissions of acts involving violence. Four defendants, Vicente Garcia, Alphonso Chavez, Jose Guzman, and Augustin Zambrano each face trial on charges of racketeering and conspiracy. Their alleged crimes include extortion, witness tampering, solicitation of murder, attempted murder, and murder. Zambrano is allegedly the highest ranking Latin King outside prison. Other Latin Kings charged in this case are presently fugitives. The government has placed at least three witnesses expected to testify at trial into protective custody. In light of these circumstances, the government has moved this Court to empanel an anonymous jury, and specifically to keep secret from parties, counsel, and the public the jurors' names, home addresses, and places of work. Zambrano opposes

the Motion, arguing the government has not made a showing sufficient to justify an anonymous jury under the Seventh Circuit's test in United States v. Mansoori, 304 F.3d 635 (7th Cir. 2002), and that an anonymous jury is, in any case, inappropriate in this case given an anonymous jury's potential prejudice to the defendants' rights to a thorough voir dire and presumption of innocence.

## II. DISCUSSION

### A. Standard of Decision

Empaneling an anonymous jury is an extreme measure warranted only by a "'strong reason to believe the jury needs protection.'" Mansoori, 304 F.3d at 650 (quoting United States v. Crockett, 979 F.2d 1204, 1215 (7th Cir. 1992)). The anonymous jury unquestionably "raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence." Mansoori, 304 F.3d at 650 (quoting United States v. Ross, 33 F.3d 1507, 1519 (11th Cir. 1994)). Anonymous jurors keep defendants and the public alike in the dark about certain juror information potentially useful in making challenges–particularly peremptory challenges–during the selection of the jury. Id. (citing United States v. DiDomenico, 78 F.3d 294, 301 (7th Cir. 1996)).

Nevertheless, "'neither the right to a presumption of innocence nor the right to exercise peremptory challenges is a constitutional absolute; each, at times, must yield to the legitimate demands of trial administration and courtroom security so long as steps are taken to ensure that the defendant receives a fair trial.'" Id. (quoting United States v. Edmond, 52 F.3d 1080, 1090 (D.C. Cir. 1995)). The use of an anonymous jury is committed to the discretion of the district court and

2

is appropriate when there are actual threats to jurors or when jurors face a reasonable fear for their safety. Crockett, 979 F.2d at 1215-16.[1]

In an anonymous jury determination, the interests at stake include: (1) the defendant's interest in preserving the presumption of innocence; (2) the defendant's interest in conducting a useful voir dire; (3) the jurors' interest in their own security; and (4) the public's interest in having a jury assess the defendant's guilt or innocence impartially. Mansoori, 304 F.3d at 650 (citing United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994)). A court must weigh the defendants' interests against those of the jurors and the public. In weighing these interests, the Seventh Circuit in Mansoori identified five factors, neither exhaustive nor dispositive, that bear on the propriety of an anonymous jury. Id. Courts must consider: (1) the defendant's involvement in organized crime; (2) the defendant's participation in a group with the capacity to harm jurors; (3) whether the defendant previously has attempted to interfere with the judicial process; (4) the severity of the punishment that the defendant would face if convicted; and (5) whether publicity regarding the case presents the prospect that the jurors' names could become public and expose them to intimidation or harassment. Id. at 650-51. Accordingly, the Court assesses the five Mansoori factors and then balances the interests of the defendants, the jurors, and the public.

---

[1] The Crockett court observed:
> In the usual circumstance, the parties have available to them the names, addresses, and occupations of potential jurors. This information is useful during voir dire. In the process of impaneling a jury, the parties can use this information in formulating questions with which to probe potential jurors for possible prejudices, biases, or any other factors that might make a juror unable to render a fair and impartial decision. In some criminal trials, however, special precautions must be taken in order to protect jurors from harassment, intimidation, anxiety, and a host of other disruptive influences. These concerns commonly arise in trials relating to large-scale organized crime or narcotics enterprises. To protect potential jurors and their families, a court may decide to withhold from the parties some of the identifying information about each juror both before and after conducting voir dire.

979 F.2d at 1215 n.10.

## B. The Government's Motion to Empanel an Anonymous Jury

<u>Mansoori</u> *Factors*

*1. Defendants' Involvement in Organized Crime & "Something More"*

The Latin Kings are reputedly the largest street gang in Chicago and the largest Hispanic street gang in the United States.[2] The government alleges that defendant Augustin Zambrano was a "Corona," the gang's highest ranking member outside prison. Superceding Indictment 5. Zambrano oversaw and controlled all Chicago factions of the Latin Kings. <u>Id.</u> Codefendant Vicente Garcia, a "Supreme Regional Enforcer," allegedly ranked second to Zambrano and orchestrated illegal affairs of the Latin Kings. <u>Id.</u> at 6. The defendants allegedly wielded the Latin Kings' formidable structure to carry out racketeering and violent crimes for nearly a decade. Government's Mot. to Empanel an Anonymous Jury 1 ["Gov't Mot."]. Specifically, the Latin Kings allegedly engaged in drug trafficking, extortion, and murder. <u>Id.</u> at 4. Evidence supporting these allegations will be presented at trial, the government contends.

Evidence of the defendants' alleged link to violent organized crime does not by itself justify an anonymous jury. "[S]omething more than the organized-crime label is required." <u>Mansoori</u>, 304 F.3d at 651. This "something more" may be shown by: (1) "'a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf,'" or by (2) "'a showing that trial evidence will depict a pattern of violence by the defendant and his associates such as would cause a juror to reasonably fear for his own safety.'" <u>Id.</u> at 651 (quoting <u>Crockett</u>, 979 F.2d

---

[2] <u>Latin Kings (gang)</u>, Wikipedia. http://en.wikipedia.org/wiki/Latin_Kings_(gang) (last visited Feb. 3, 2011) (estimating 25,000 members in Chicago); <u>Appendix B. Street Gangs</u>, National Gang Threat Assessment 2009, http://www.justice.gov/ndic/pubs32/32146/appb.htm#start (last visited Feb. 1, 2011) (finding Latin Kings operating in 158 cities in 31 states with 20,000-35,000 members nationally).

at 1216). Here, the Court finds that "something more" is present both in the graphic evidence the government says it will put on at trial and by the likelihood of obstruction of justice carried out by defendants, their associates, or both.

The government says it will present evidence that the gang did whatever was necessary to evade criminal liability, including intimidating witnesses, intimidating victims, and carrying out murder. Gov't Mot. 4. For example, the government will play a taped conversation capturing a Latin Kings codefendant's resolve to eliminate a witness cooperating with police, saying "she took the cops to the pistol . . . So, we gotta take care of that lady now." Id. at 5-6. Moreover, this codefendant, Fernando Vazquez, is a fugitive and could remain at large throughout the trial. Id. Another tape recording captures a Latin Kings leader speaking to a 2006 meeting of gang members in which he urges them to swifty eliminate suspected police collaborators by invoking as exemplars ruthless mobsters of yesteryear because "they didn't wait, man, BOOM." Id. Ex. B, at 7. The judicial system's experience with codefendant Fernando King, another allegedly high-ranking Latin King tried in a separate 2008 drug trafficking case, may be a harbinger. When that jury delivered its guilty verdict, it included a note to the judge: "There are several jury members that have concerns regarding personal safety and security." Id. Ex. B, at 1. The Court finds a sufficient showing that the government's evidence at trial would cause a juror to reasonably fear for his or her safety. The Court finds the same allegations show a likelihood of obstruction of justice on the part of Latin Kings gang members acting on the defendants' behalf. It is central to the Court's finding that in response to the likelihood of obstruction of justice the government has placed three witnesses in

protective custody. In this case, there is clearly "something more" than a scary "label" such that empaneling an anonymous jury is justified. Therefore this factor is present.

### 2. Defendants' Participation in an Organization with the Capacity to Harm Jurors

The government says it will present evidence at trial linking five shootings to the Latin Kings, who systematically replenish a fund specifically for purchasing firearms for gang member use. Gov't Mot. 5. Several charged Latin Kings are fugitives, in addition to Fernando Vasquez, and may remain at large throughout trial. Id. Many uncharged Latin Kings live in and around Chicago. Id. A number of these at-large gang members are allegedly willing to use the ample supply of guns to threaten and harm. Id. Additionally, the government will play a tape recording featuring a Latin Kings leader saying at the 2006 meeting, "we're responsible for homicide, we're responsible for taking care of family." Id. Ex. B, at 2. The Court therefore finds that because of the alleged close proximity and firepower of the defendants' organization, as well as its apparent loyalty to fellow members and ready willingness to use its firepower, the defendants indeed participate in an organization with the capacity to harm jurors. See United States v. Shryock, 342 F.3d 948, 972 (9th Cir. 2003) (finding a capacity to harm jurors where, "[a]t the time of trial, there were hundreds of Mexican Mafia members and associates still at large"). This factor is present.

### 3. Whether the Defendants Have Attempted to Interfere with the Judicial Process

The government claims "the Latin Kings have an ongoing policy of interfering with the judicial process." Gov't Mot. 6. The government refers to evidence that chiefly dissuades or cuts off gang member cooperation with police. The Court is not persuaded that a gang member's police cooperation–at least before charges or indictment–is necessarily part of the "judicial process"

6

Mansoori contemplates. Gangs everywhere frown on so-called snitching and non-cooperation with police is commonplace. The government offers no specific evidence that the Latin Kings or the defendants have threatened reprisals once the judicial process has initiated. Instead, the government refers to the Chapter Constitution of the Almighty Latin Kings Nation, which allegedly embraces a "code of silence." Gov't Mot. Ex. A. The constitution states: "Nation affairs are to be kept within the Nation." Ex. A, art. XXIII, § o. It also states: "Any member found guilty of being a traitor, stool-pigeon or police collaborator shall automatically be expelled from the Nation." Id. § j.

While the Court acknowledges that applying rules of construction to a street gang's alleged constitution may be naive, the Court takes the document on the same terms the government presents it—at its word. Section "o" requires confidentiality about business affairs and nothing more. While section "j" does not exclude witness or juror tampering, on its face it focuses not on judicial interference but police avoidance. Courts elsewhere considering gang codes of silence found judicial interference present where the code required *lying in court* about gang affairs. See, e.g., Shryock, 342 F.2d at 972; see also Crockett, 979 F.2d at 1216 (noting that the defendant was in pretrial detention when he threatened lives of witnesses).

Nevertheless, the Court finds persuasive the government's tape recordings, discussed earlier, of gang leaders urging a shoot-first, ask-questions-later approach to suspected police collaborators. The gang's attitude does not seem to discriminate on the basis of whether indictments are issued. Most importantly, however, the government says its trial witnesses will testify that the Latin Kings placed "kill on sight" orders on them. Gov't Mot. 7. Assuming these kill orders remain in place, and the Court for purposes of this Motion does, it is evidence of not just a previous but an ongoing

7

attempt by the defendants' organization to interfere with the judicial process, since witness tampering falls within the "judicial process" Mansoori contemplates. See also Edmond, 52 F.3d at 1092. Attempting to murder a government witness harms the judicial process by sending "a powerfully frightening message to others of the terrible consequences awaiting anyone who cooperated with the defendants' prosecution." United States v. Kahn, 591 F. Supp. 2d 166, 169 (E.D.N.Y. 2008) (quoting United States v. Quinones, 511 F.3d 289, 295-96 (2d Cir. 2007)). The Court therefore finds this factor present.

*4. The Severity of the Punishment the Defendants Would Face if Convicted*

This factor assesses the strength of a defendant's incentive to attempt to tamper with a juror or witness to avoid conviction. The problem, as the Seventh Circuit has observed, is that the threat of lengthy sentences is too routine to closely bear on whether an anonymous jury is needed. Mansoori, 304 F.3d at 651. Nevertheless, it is true that the defendants each face no fewer than forty years in prison and some face up to life in prison if convicted. Gov't Mot. 7. The Court finds this factor is present as a potential incentive for the defendants to try to tamper with jurors or witnesses.

Regarding this factor and the second factor, the capacity to harm jurors, Mansoori requires more than a showing that "the defendants had the ability and incentive to threaten jurors." 304 F.3d at 651. There must be "additional evidence indicating that they were *likely to act* on that ability and incentive" to justify an anonymous jury. Id. (emphasis added). The Court finds this "additional evidence" in the gang's "kill on sight" orders for government witnesses, evincing not just a likelihood but an actual allegation of leveling threats at trial witnesses, which is "more than adequate to suggest a real possibility that a defendant will threaten or otherwise tamper with jurors." Edmond,

8

52 F.3d at 1092. The government believes the defendants are so likely to act that it has placed at least three trial witnesses into protective custody.

### 5. Whether Publicity Could Expose Jurors to Intimidation or Harassment

The lesser of jurors' fears in this case may be the limelight. Still, the Court takes notice of a reporter from a major Chicago daily newspaper attending a status conference in this case and that a major Chicago daily newspaper has ordered transcripts of hearings in this case. The Court also takes notice of the fact that the Latin Kings gang is popular media fodder. For example, the *Chicago Tribune* has written at least seven stories about the Latin Kings in the past three years, including three stories connected to this case.[3] Once this case goes to trial, it is likely to receive a substantial dose of media attention. The Ninth Circuit upheld the use of an anonymous jury in a notorious street gang's trial where the trial court forecasted media coverage. Shyrock, 342 F.3d at 972. Similarly, the Court finds that this factor, if a comparably lesser threat, is inescapably present.

The Court therefore finds present all five Mansoori factors, which favor empaneling an anonymous jury. The Court turns to weighing the four interests the Seventh Circuit notes are at stake when considering whether to grant the government's Motion, paying particular attention to the rights of jurors to serve unfettered by serious threats to their security.

---

[3] Latin Kings, Chi. Trib., http://articles.chicagotribune.com/keyword/latin-kings (last visited Jan. 26, 2011).

<u>*Competing Interests in an Anonymous Jury Analysis*</u>

*1. Defendants' Interest in Preserving the Presumption of Innocence*

Empaneling an anonymous jury "raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence." <u>Mansoori</u>, 304 F.3d at 650. The Court recognizes the defendants' Fifth Amendment rights may be hampered by an anonymous jury, but that any inference jurors may draw from their anonymity about the defendants will be *de minimis* compared to the graphic evidence the government says it will present at trial. <u>See</u> <u>United States v. King</u>, 627 F.3d 641, 651 (7th Cir. 2010) (noting Fernando King, a codefendant in this case, expressly conceded "jurors' fears likely originated from the invocation of his membership with the Latin Kings" in an earlier trial with a public jury). The Court believes a juror who feels safe is more likely to render an impartial verdict,[4] thereby preserving as much as possible the defendants' presumption of innocence and right to a fair trial.

The Court has considered alternatives to an anonymous jury. <u>See</u> <u>United States v. Blagojevich</u>, 612 F.3d 558, 564 (7th Cir. 2010). One alternative is a wait-and-see approach. Should publicly identified jurors receive threats making them "genuinely fearful," the Court can sequester them or even dismiss them. <u>United States v. McAnderson</u>, 914 F.2d 934, 943-44 (7th Cir. 1990). In <u>McAnderson</u>, the defendants led the El Rukns, a violent Chicago street gang backed by the Libyan

---

[4] When given the choice, studies show virtually every juror prefers anonymity. Christopher Keleher, <u>The Repurcussions of Anonymous Juries</u>, 44 U.S.F. L. Rev. 531, 552 (2010). Anonymous juries, according to scant and dated research, are also more prone to convict, <u>id.</u> at 561, but the Court is not aware of any research on the conviction or acquittal rates of terrified jurors. It is enough that impartiality is imperiled when jurors are afraid.

government, which made threatening phone calls to jurors after trial began. Id. at 938, 943-44. This Court dismissed five jurors and sequestered the rest. Id. at 943. While appropriate, such measures are abrupt, dramatic, and less amenable to a neutral explanation than empaneling an anonymous jury in the first place. See id. A wait-and-see approach, in this case, risks far greater prejudice to the defendants. The Court considered Zambrano's suggestion of a protective order confining names of jurors to counsel and clients. See Augustin Zambrano's Mot. in Resp. to Gov't Mot. 6. The Court agrees that this solution would alleviate media attention. But as discussed earlier the limelight is not the chief cause for concern in this case. Finally, the Court considers Section 10(a) of the Northern District of Illinois's jury selection plan, created pursuant to 28 U.S.C. §§ 1861-78. The plan states: "Any judge of this Court may order that the names of jurors involved in a trial presided over by that judge remain confidential if the interests of justice so require." Plan for Random Selection of Jurors 10(a) (2006). The Court must make a finding justifying such an order, Waller v. Georgia, 467 U.S. 39, 48 (1984), which would be easily satisfied here. But a Section 10(a) order cloaks only "the names of jurors," leaving exposed jurors' home addresses and places of work, both of which would be uttered in open court during voir dire. The Court believes that trial administration is best served, and the defendants' presumption of innocence and right to a fair trial best preserved, by an anonymous jury.

### 2. Defendants' Interest in Conducting a Useful Voir Dire

The Court expects to conduct a "searching and thorough" voir dire while shielding jurors' names, home addresses, and places of work. Mansoori, 304 F.3d at 652. A probing voir dire contemplates the concerns of Batson v. Kentucky, 476 U.S. 79 (1986), and substantially ameliorates

the prejudice anonymity poses. Id. The Court is aware of competing views of instructions to anonymous jurors. The Seventh Circuit has upheld instructions telling jurors the reason for anonymity is merely to protect them from contact with outside parties and is a routine procedure, not because a defendant is dangerous. See Crockett, 979 F.2d at 1216-17. This approach appears least prejudicial. But some courts and prosecutors fear jurors wise up once the prosecution unveils its claims of a defendant's severe criminal behavior, such as when a defendant is a leader in a notorious organized crime operation, as the government alleges in this case. In such situations there is a risk that jurors distrust the judge and the rest of the proceeding, undermining the integrity of the verdict.[5] At this time, the Court takes no position on instructions, except to note that jury instructions designed to downplay the prejudice of anonymity have widely been upheld as preserving the defendant's presumption of innocence. Reminding the jury at multiple junctures of the defendant's presumed innocence further ensures a defendant's rights. Id. at 1216. The Court will invite both the government and defense counsel to propose instructions. For now, the Court takes under advisement the parties' arguments for the proper instruction to anonymous jurors.

### 3. Public's Interest in Having an Impartial Jury

From the public's perspective, the principal rationale for the anonymous jury is that a fearful jury loses its impartiality. The principal criticism is that anonymous jurors lose their accountability.

---

[5] Patrick J. Fitzgerald, U.S. Attorney for the Northern District of Illinois, recently opined:
The one thing I think that we have done that I question is that we often tell jurors reasons for the anonymity of the jury that are not quite accurate. . . . You wonder when jurors start hearing about evidence of violence whether or not they will credit the judge's explanation early on that this is an ordinary practice and that they are being shielded either from the media or from the efforts of the court to invade their privacy. . . . [W]e should find a neutral way that is more credible that will tell the juries why that is going on.
Patrick J. Fitzgerald, Thoughts on How the Legal System Treats Jurors, 2009 Wis. L. Rev. 1, 12-13 (Thomas E. Fairchild Lecture, delivered April 18, 2008).

The public's interest is in a jury that is not partial, not necessarily a jury that is publicized. Ordinarily sunshine disinfects, and the Court recognizes organized crime figures, and specifically other Latin Kings, have been tried without anonymous juries. See, e.g., United States v. Diaz, 176 F.3d 52, 73-75 (2nd Cir. 1999) (delving into the history and structure of the Latin Kings); but cf. Morales v. United States, 294 F. Supp. 2d 174, 177-78 (D. Conn. 2003) (effectively closing the courtroom during jury selection for the "high-profile" trial of a Latin Kings gang member, but stopping short of using an anonymous jury). The problem here, as already discussed, is that jurors are likely to reasonably fear for their safety, which threatens bias and partiality. The public is better served by an anonymous impartial jury than a publicly accountable jury biased by fear and threats.

*4. Jurors' Interest in Their Own Security*

The Seventh Circuit recognizes that "[j]urors are entitled to be treated with respectful regard for their privacy and dignity." United States v. Blagojevich, 614 F.3d 287, 292 (7th Cir. 2010). Moreover, "[a] degree of anonymity safeguards jurors from intimidation during trial, promotes vigorous debate in the jury room, allows jurors to focus on the facts rather than on how the public might receive their verdict, reduces jurors' anxiety (which may improve jury deliberations), and makes people less reluctant to serve on juries." Id. at 293. Jurors still must be accountable. "That is something that, when you are an American citizen, you just sign up for. We have a responsibility to serve on juries." Hon. Reena Raggi, Panel One, 79 Fordham L. Rev. 1, 14 (2010) (Conference on Privacy and Internet Access to Court Files). Indeed, the trend in the past three decades of increased use of the anonymous jury in criminal trials is troubling to many, and is to some "appalling." Id.

The Court cannot overlook the twenty-three guilty pleas it has taken from codefendants in a case featuring widespread acts of violence. See, e.g., Superceding Indictment 2-24. Jurors' interest in their own security from potential threats by a gang known to allegedly have ordered hits even now in place on government trial witnesses is an overriding concern for this Court. This Circuit recognizes that an anonymous jury need not foreclose the Fifth and Sixth Amendment rights of defendants. Nor should it kneecap accountability. "The goal of the Sixth Amendment is 'jury impartiality with respect to both contestants.'" Georgia v. McCollum, 505 U.S. 42, 58 (1992) (quoting Holland v. Illinois, 493 U.S. 474, 483 (1990)). Under these circumstances, the Court finds anonymity the best avenue to impartiality.

Moreover, jurors' interest under Powers v. Ohio, 499 U.S. 400 (1991), in serving unfettered by improper state action is implicated when a genuine issue of juror safety is likely to cast "doubt on the integrity of the judicial process." Id. at 411. In this case, making public jurors' identities during voir dire will likely cast doubt on the proceedings because jurors threatened or fearful of a defendant cease to be "'the peers or equals of the person whose rights [they are] selected or summoned to determine.'" Batson, 476 U.S. at 86 (quoting Strauder v. West Virginia, 100 U.S. 303, 308 (1880)). Threats or fears can subordinate a juror to a defendant and hardly promotes equitable treatment, much less equanimity. In such a scenario, a properly empaneled anonymous jury fulfills the promise of Batson and its progeny. Batson "was designed to serve multiple ends" and it has repeatedly been extended to protect "the dignity of persons" and "the integrity of the courts." McCollum, 505 U.S. 42, 48 (1992). Jurors have a right to serve unfettered by improper state conduct much like voters protected from undue influence. See Burson v. Freemon, 504 U.S. 191, 199

(1992); Powers, 499 U.S. at 407 ("Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process."). Failing to make jurors anonymous when their security is threatened "would be an irresponsible act" by the Court. United States v. Pasciuti, 803 F. Supp. 499, 502 (D.N.H. 1992) (empaneling anonymous jury for trial of alleged gang members).

A court's failure to act to protect jurors can harm a defendant's right to a fair trial and the public interest in the integrity of the proceedings. Jurors in this case have a right to security during their service. The jury is "a quintessential government body–indeed, the institution of government on which our judicial system depends." McCollum, 505 U.S. at 54. A failure to act to protect "the institution of government on which our judicial system depends" under circumstances where genuine threats from organized crime exist is a failure to exercise proper state conduct and strays from the equal protection interests Batson and Powers recognize jurors possess. Inaction in this case could well "invite[] cynicism respecting the jury's neutrality." Powers, 499 U.S. at 412.

### III. CONCLUSION

Alleged threats from the defendants' organization have forced government trial witnesses into hiding. Not to be outdone, the government has charged several members of the Latin Kings now on the lam. Then there are the uncharged members of the Latin Kings, some armed and many present in and around Chicago, allegedly willing to eliminate witnesses to protect their fellow gang

members.[6] The Court has found all five <u>Mansoori</u> factors present, and is obliged to try this case on its merits and to keep alleged threats to jurors and the judicial process out of court. The unusually pressing interests of the jurors and the public clearly "outweigh" the defendants' own substantial interests. As this Court has discussed, however, these interests are not at odds. The defendants' interest in a presumption of innocence here calls for anonymous jurors whose assurance of heightened safety ensures as much as possible their ability to presume the defendants innocent and render a fair verdict. As Justice Kennedy wrote in <u>Powers</u>, "The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair." 499 U.S. at 413. For the foregoing reasons, the Government's Motion to Empanel an Anonymous Jury is granted.

IT IS SO ORDERED

ENTER:

CHARLES RONALD NORGLE, Judge

United States District Court

DATED: February 4, 2011

---

[6] The Court takes notice of the fact that the Latin Kings if only by dint of publicity breed witness fear. <u>Sheriff: Man Held in Child's Slaying Wanted 3 Witnesses Killed</u>, Chi. Breaking News Ctr., July 15, 2010, http://archive.chicagobreakingnews.com/2010/07/gang-member-charged-with-trying-to-have-3-witnesses-killed.html (Latin Kings gang member alleged to have ordered hits on witnesses from prison).

16